**JOHN L. BURRIS, ESQ., SBN 69888**
**BEN NISENBAUM, ESQ., SBN 222173**
**JAMES COOK, ESQ., SBN 300212**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Center
7677 Oakport Street, Suite 1120 Oakland, CA 94621
Telephone:  (510) 839-5200
Facsimile:  (510) 839-3882
Email:  John.Burris@johnburrislaw.com
Email:  Ben.Nisenbaum@johnburrislaw.com
Email:  James.Cook@johnburrislaw.com
Attorneys for Plaintiffs
BARBARA DOSS, et al.

**JEROME M. VARANINI, (State Bar No. 58531)**
641 Fulton Avenue, Suite 200
Sacramento, CA 95825
Telephone: (916) 993-4868
Facsimile: (916) 993-6750
Attorneys for Defendants
WELLPATH, INC, MICHAEL DURBIN
MICHAEL NARIA, MARIA SADRI, and NEENA THOMAS

**PETER G. BERTLING (SBN 131602)**
**JEMMA PARKER SAUNDERS (SBN 227962)**
Bertling Law Group
21 East Canon Perdido Street, Suite 204B
Santa Barbara, CA 93101
Telephone: 805-879-7558
Facsimile: 805-869-1597
Attorneys for GARCIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA DOSS, et al., | CASE NO.: 3:19-cv-07940-CRB |
| Plaintifs, | **JOINT STATUS REPORT** |
| vs. | **Conference Date**: October 13, 2023<br>**Time:** 10:00 A.M.<br>**Location**: Video Conference |
| COUNTY OF ALAMEDA, et al., | |
| Defendants. | **Trial Date**: TBD |

Hon. Charles R. Breyer

Pursuant to the Courts Status Order, the parties submit the following Joint Status Report:

**1.**     Scheduling Update:

The parties respectfully inform the Court that the parties have a settlement conference before Judge Beeler scheduled for February 13, 2024 at 10:00 a.m.

**2.**     Jurisdiction and Service

Plaintiffs filed this case in federal court and assert federal question jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§1391(b).  Service is complete.

**3.**     Facts

**a.**     Plaintiffs' Contention

On June 22, 2018, at approximately 8:37 p.m.,  Decedent reported to the Alameda County Sheriff's Office at Santa Rita Jail in Dublin, California. As part of sentencing in an unrelated criminal matter, Decedent was to serve time by reporting to the Jail Weekend Inmate Program at Santa Rita Jail. The incident in question took place on Decedent's second consecutive weekend reporting to Santa Rita Jail. Decedent had four months to serve in weekend increments at Santa Rita Jail.

Upon reporting to Santa Rita Jail, Decedent was cleared and admitted for his weekend comittment by Alameda County Sheriff's Office's intake staff, in spite of having ingested narcotics sometime before admission and exhibiting clear symptoms that he was under severe distress.

On the evening of June 22, 2018, Decedent placed several phone calls to his girlfriend, Chastity Williams.  Decedent's dialogue and responses were "limited as he typically responded slowly with few words and/or disjointed sentences."

Barbara Doss, et al. v. County of Alameda, et al. Case No.: 3:19-cv-07940-CRB

2

On June 23, 2018, at approximately 5:25 a.m., Defendant RIVERA-VELAZQUEZ and witness, Deputy Soto, observed Decedent, who had difficulty expressing coherent words to the deputies.  Deputy Soto told the Intake Deputies about Decedent's behavior.

Deputy Valentine, who began his shift at 5:00 a.m. on June 23, 2018, observed decedent yell "Help me!", with Decedent's behavior worsening, as he kneeled on all fours, barked, cried and desperately continued yelling out "Help me!.  Nonetheless, there is no record that suggests that any help was given to Decedent at this time.

At approximately 6:08 a.m., Decedent allegedly first notified Defendant deputies that he was "high."  Deputy Hoodye alleges that Decedent communicated to him that this was his first time being high. According to Deputy Soto, Decedent had trouble communicating this simple statement to the deputies.

By 7:20 a.m., Decedent's condition was so severe that he continuously banged on his cell door. However, instead of providing immediate medical care to Decedent, Defendants transferred Decedent from this initial cell because it was located near the nurses's station and his alarming behaviour allegedly made it difficult for the nurses to work on other tasks. During this time, deputies advised WELLPATH Nurses GUADALUPE GARCIA that ARMSTRONG was acting irradically. Deputies requested GARCIA check on ARMSTRONG. GARCIA knew, or should have known, that ARMSTRONG was suffering from the effects of illicit drugs.

At approximately 7:31 a.m., GARCIA collected a urine sample from Decedent, without incident. While collecting the sample, ARMSTRONG was incoherrent and slow to respond. However, GARCIA failed to do a medical intake on ARMSTRONG at this time. Nonetheless, by 9:30 a.m., Decedent was observed completely naked in his cell.  No recorded action was taken. At about 11:08 a.m., Defendant Deputy TOWNSEND conducted a general observation check,

whereupon he observed Decedent still naked in his cell. During this interaction, Decedent once again notified Defendants of the drugs he had consumed the prior day.

At approximately 2:10 p.m., Deputy Bryning observed Decedent, who was still naked in his cell, still displaying symptoms of distress. Decedent was staring right through Deputy Bryning as if Deputy Bryning were not there.

At approximately 2:20 p.m., Deputy Eastus observed Decedent standing inside his cell, still completely naked. At this point, Decedent's behavior had drastically worsened from bizarre to alarming. Around this same time, Deputy Moruza and Deputy Soto, who witnessed Decedent's behavior, allegedly reported to GARCIA that Decedent needed medical attention. ARMSTRONG was observed sticking his fingers in his mouth and his anus. At that point GARCIA tested his urine. A preliminary drug screening test revealed ARMSTRONG had consumed cocaine, methamphetamine, and marijuana. Nurse GARCIA still failed to provide medical care to ARMSTRONG.

At approximately 2:36 p.m., Defendant Deputy TOWNSEND observed Decedent's behavior and noted it to be "associated with being paranoid and scared of everyone around him." Nurse GARCIA and Nurse MARIA SADRI then attempted to complete ARMSTRONG'S triage intake screening. GARCIA and SADRI witnessed ARMSTRONG exhibiting unusual behavior. ARMSTRONG was naked and slowly put his hands out of the cuffing port. His actions were indicative that he was suffering from a medical emergency. Further, GARCIA noted that ARMSTRONG tested positive for marijuana, methamphetamine, and cocaine. GARCIA noted that ARMSTRONG was hyperactive, uncooperative, and danger to others. Nonetheless, no recorded aid of any sort was provided to Decedent during this time of crisis.

At approximately 3:00 p.m., Deputy Valentine reported that even though Decedent's condition had worsened, he was cleared for further incarceration. Around this time, nurses first alerted Nurse MICHAEL DURBIN that ARMSTRONG was under the influence of cocaine, methamphetamine, marijuana, and a benzodiazepine. DURBIN and nurse MICHAEL NARIA then performed a visual check of ARMSTRONG. They witnessed armstrong appearing "zombie like". DURBIN and NARIA failed to take ARMSTRONG'S vitals or provide any medical care to him at that time.

Shortly thereafter, DURBIN contacted the Outpatient Housing Unit (OPHU). DURBIN spoke to FNP NEENA THOMAS. ARMSTRONG needed to be transported to a hospital. However, THOMAS made the decision to transport ARMSTRONG to the OPHU instead of a hospital. THOMAS failed to consult with a doctor before making the decision to not transfer ARMSTRONG to the hospital. Still, DURBIN failed to even transfer ARMSTRONG to the OPHU at this time.

At approximately 3:31 p.m., members of the nursing staff informed Defendant Deputy RIVERA-VELAZQUEZ that Decedent needed to be transported to the Outpatient Housing Unit. However, there are no records that reflect that Defendant Deputy RIVERA-VELAZQUEZ acted upon this medical advice and Decedent remained in his cell without any care.

Defendants waited almost 24 hours, from the time Decedent reported to Santa Rita jail, to attempt to provide him with the medical care he desperately needed during Decedent's time of crisis while in Defendants' custody. Defendants recklessly disregarded Decedent's behavior, which clearly reflected that he needed specialized medical care.

At approximately 6:30 p.m., almost 22 hours after Decedent initially reprted to Santa Rita Jail, Defendants finally began to transport Decedent to the Outpatient Housing Unit.

Barbara Doss, et al. v. County of Alameda, et al. Case No.: 3:19-cv-07940-CRB

5

Decedent was initially transported by Defendants PLOSSER, RIVERA-VELAZQUEZ and CALHOUN. Shortly after the transportation began, Decedent increasingly became more agitated and distressed as Defendants COSTANZO, DEVINE and GREEN joined the transportation.

During transportation, Decedent continued to exhibit symptoms of paranoia and severe distress, resulting in him being reluctant to be taken out of his cell and walked to the Outpatient Housing Unit.

At some point during transportation, Defendant Deputies took Decedent to the ground, whereby they slammed Decedent down to the ground and began violently striking Decedent with their knees and feet.

At some point while Decedent was on the ground being violently kneed and kicked by Defendant Deputies PLOSSER, CALHOUN, RIVERA-VELAZQUEZ, DEVINE, CONSTANZO and GREEN, the decision was made to place Decedent in a WRAP device.  Decedent was in a calm state when the WRAP leg restraints were applied.

Despite showing obvious signs of distress and paranoia, Decedent, while handcuffed behind his back and sitting in a L position, was asphyxiated by restraint, as the officers forced Decedent's upper body towards his feet, with Defendant deputies applying force on Decedent's head, neck, shoulder and back.  Defendants then placed Decedent in a WRAP device.  In addition, though he was not spitting, a spit mask was placed over Decedent's head.

Defendant Moschetti allegedly performed a blood pressure check, which purportedly did not raise any concerns for Decedent's medical condition.  However, shortly thereafter, a nurse attempted to check Decedent's pulse and was unable to locate one.  Despite resuscitation efforts, Decedent was pronounced deceased at 7:24 p.m.

Barbara Doss, et al. v. County of Alameda, et al. Case No.: 3:19-cv-07940-CRB

6

As stated in the Coroner's Report, Decedent died as a result of being asphyxiated by Defendants during restraint. Plaintiffs contend that that Decedent was dead or dying when the spit mask was put on his face, and that Defendants placed the spit mask to conceal Decedent's actual medical condition, that Decedent was dead or dying.

To add further insult to injury, Alameda County Officials within the District Attorney's Office placed a "media hold" on the coroner's report, which prevented Plaintiffs from accessing the information for over a year. This report contains critical information that would have provided Decedent's family with answers regarding the circumstances surrounding their loved one's death. Instead, Plaintiffs were simply left to speculate for over one year regarding Decedent's death.

Plaintiffs are informed and believe and thereon allege that Alameda County, and DOES 26-50, inclusive, breached their duty of care to the public in that they have failed to discipline Defendant Officers PLOSSER, CALHOUN, RIVERA-VELAZQUEZ, DEVINE, CONSTANZO, GREEN and DOES 1-25 inclusive, for their respective misconduct and involvement in the incident described herein. Their failure to discipline Defendant Officers PLOSSER, CALHOUN, RIVERA-VELAZQUEZ, DEVINE, CONSTANZO, GREEN and DOES 1-25 inclusive, demonstrates the existence of an entrenched culture, policy or practice of promoting, tolerating and/or ratifying with deliberate indifference, the use of excessive and/or deadly force used by Defendants PLOSSER, CALHOUN, RIVERA-VELAZQUEZ, DEVINE, CONSTANZO, GREEN and Does 1-25 inclusive, amounting to severe misconduct.   Plaintiffs further contend that this includes failing to train said Defendants, and all or most Alameda County Deputy Sheriffs, in how to avoid asphyxiating subjects during restraint, in violation of standard law enforcement training.  Plaintiffs contend that high level policy makers, including Sheriff Gregory Ahern, and other policy makers, were aware of the deficiencies in training in how to avoid asphyxiation during restraint, but nonetheless permitted

Alameda County Deputies to work in situations where they would routinely be expected to conduct restraints of inmates, thereby foreseeably exposing inmates supervised by Alameda County deputies to the foreseeable risk of being killed by being unreasonably asphyxiated during restraint.

Plaintiffs are informed, believe and thereon allege that members of the Alameda County Sheriff's Office, including, but not limited to Defendant Officers and DOES 1-25 inclusive and/or each of them, have individually and/or while acting in concert with one another used excessive, arbitrary and/or unreasonable force against decedent.

Plaintiffs are further informed, believe and therein allege that as a matter of official policy – rooted in an entrenched posture of deliberate indifference to the constitutional rights of persons who live, work or visit Alameda County, the Alameda County Sheriff's Office has allowed persons to be abused by its Deputies, including Defendant Deputies PLOSSER, CALHOUN, RIVERA-VELAZQUEZ, DEVINE, CONSTANZO, GREEN and DOES 1-25 and/or each of them, individually and/or while acting in concert with one another.

Plaintiffs are informed, believe and therein allege that Alameda County Sheriff's Office deputies exhibit a pattern and practice of using excessive and/or deadly force against citizens.

Plaintiffs are informed, believe and therein allege that Alameda County knew, had reason to know by way of actual or constructive notice, of the aforementioned policy, culture, pattern and/or practice and the complained of conduct and resultant injuries/violations.

      b.  Defendants' Contentions

Defendants:

Dujuan Armstrong was convicted of burglary and sentenced to serve 120 days in jail. He was authorized to complete his jail time on weekends. On June 22, 2018, Armstrong arrived at Santa Rita Jail at 8:37 p.m. He was not provided a medical assessment since he answered "no" to all medical

questions. Based on observations, he was transferred to a "sobering" cell, which requires a medical evaluation. On June 23rd, Armstrong admitted to an ACSO deputy that he was under the influence of narcotics. Several ACSO deputies suspected that Armstrong had ingested narcotics and/or possibly had drugs in his rectum while at the jail (e.g. on June 23rd, ACSO deputy Valentine observed Armstrong "on all fours screaming for help", growling, crying, stripping off his clothes, placing his finger into his anus then his mouth and chewing on the toilet). His urine sample was taken. The sample tested positive for cocaine, methamphetamine and marijuana. Ultimately, a medical assessment of Armstrong was completed.

During Armstrong's transport to the OPHU he physically resisted deputies while he was handcuffed, including attempting to walk in the opposite direction, pushing back on the ACSO deputies, attempting to run from deputies, and attempting to trip deputies. After placing Armstrong in a prone position, deputies used force to physically control him.

During the application of the WRAP, Armstrong continued to resist, pushing his body back towards the deputies. To secure the WRAP, deputies pushed/pulled Armstrong's upper body and head forward, using their body weight in order to secure the WRAP. After Armstrong was observed to be not moving, medical staff was summoned and then performed life-saving efforts. Ultimately, Armstrong passed away.

On June 25th, Dr. Magat, the Medical Director of CFMG, opined that cardiopulmonary arrest was the preliminary cause of death. She noted that Armstrong was 5'11" and weighed 271 pounds. At intake, he appeared angry and uncooperative. His drug screen confirmed the presence of marijuana, cocaine, and methamphetamine. She also noted that he became increasingly agitated and resistive while being transported to OPHU resulting in ACSO deputies using force to retain him.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The autopsy of Armstrong was conducted by Dr. M. Ferenc, a forensic pathologist. The findings indicated that Armstrong had preexisting pulmonary congestion, cardiac hypertrophy and dilation, and borderline severe obesity. Petechiae were located in his eye and minor external injuries were located on his wrist and hand. Armstrong's toxicology results were positive for cocaine metabolite and marijuana metabolite. However, in contrast to Dr. Magat's findings, Dr. Ferenc concluded that Armstrong's drug use did not contribute to his death. Instead, Dr. Ference concluded that the official cause of death was mechanical asphyxia.

Medical defendants assert that the care provided to the inmate patent Mr. Armstrong was appropriate for the condition as presented by the patient, met applicable standards and that there was no deliberate indifference to any serious medical need of the patient as alleged or at all.  Finally, medical defendants assert they were not the direct or proximate cause of any of plaintiff's claimed injuries or damages. Medical defendants otherwise dispute plaintiff's contentions.

**1.** Legal Issues

The complaint currently asserts the following federal claims against Defendants: 1) Section 1983 violation of the Fourth Amendment; 2) Section 1983 violation of the Eighth Amendment – Decedents Right to be Free from Cruel and Unusual Punishment; 3) Section 1983 violation – Plaintiffs' civil right to a familial relationship; 4) Section 1983 *Monell*.  In addition, the complaint asserts the following state law claims: 1) violation of California Civil Code § 52.1; 2) violation of California Civil Code § 845.6; 3) negligence. These claims raise at least the following issues:  1) whether defendants treated decedent with deliberate indifference; 2) whether the defendants caused decedent's wrongful death; 3) whether the individual officer deputies violated Plaintiffs' civil rights; 4) whether the individual deputies were negligent; and 5) whether the individual officers are entitled to qualified immunity.

Defendants:

1) Whether Defendants were deliberately indifferent to Plaintiff/decedent.

2) Whether the actions or omissions of any Defendant were the proximate cause of injury to decedent.

3) Whether Defendants were deliberately indifferent to the medical needs of decedent.

4) Whether Plaintiff's damages, if any, were proximately or legally caused by Defendants.

5) What amount of damages, including compensatory and punitive damages, should be awarded to Plaintiff on a finding of liability against any Defendant(s).

6) Whether any immunities apply to any claims, including absolute or qualified immunity for any of the named Defendants.

7) Whether defendants met the standard of care.

8) Whether CFMG is liable to plaintiff pursuant to *Monell*.

9) Whether defendants caused or were a substantial factor in causing decedent's death.

10) Whether there were intervening or superseding factors related to decedent's death.

11) Whether third parties were the legal cause of plaintiff's injuries or decedent's death.

### 2.    Motions

Plaintiffs do not anticipate any motions as this time.

Defendants may file motions for summary judgment/summary adjudication, and possible discovery motions as necessary.  Defendants may also seek to bifurcate trial and will file motions in *limine* in accord with the pretrial schedule.  No motions are currently pending.

### 3.    Amendment of Pleadings

Plaintiffs do not anticipate any amendments at this time.

### 4. Evidence Preservation

Both Plaintiffs and Defendants are aware of their duty to preserve evidence and have taken steps to preserve all potentially relevant evidence.

### 5. Disclosures

All parties have completed their initial disclosures.

### 6. Discovery

The parties do not currently anticipate the need for additional written discovery or depositions beyond that permitted by the Rules, but will meet and confer following competition of discovery allotted by the FRCP, and then if necessary, approach the Court regarding additional discovery.

### 7. Class Actions

This is not a class-action matter.

### 8. Related cases

The parties are unaware of any related cases.

### 9. Relief

Plaintiffs are seeking general, special, and punitive damages in an unspecified amount.

Defendants dispute plaintiff's entitlement to damages as plead or at all.

### 10. Settlement and ADR

The parties have a settlement conference before Judge Beeler scheduled for February 13, 2024 at 10:00 a.m.

### 11. Consent to Judge for All Purposes

Plaintiffs consent to a Magistrate Judge.

Defendants respectfully decline consent to a Magistrate Judge for all purposes.

**12.** Other reference

The parties do not believe the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**13.** Narrowing of Issues

None at this time.

**14.** Expedited Schedule

The parties do not request an expedited schedule at this time.

**15.** Scheduling:

The parties are currently following the Court's schedule at docket no. 113.

**16.** Trial:

The parties have demanded a jury trial, expected to last approximately 5-7 days.

**17.** Disclosure of Non-Party Interested Entities or Persons:

Plaintiffs:   None.

Defendant Garcia filed her disclosures of non-party interested entities or persons on August 30, 2021, Dkt. #79.

**18.** Other matters

Dated:  September 28, 2023               **THE LAW OFFICES OF JOHN L. BURRIS**

                                         /s/ *James Cook*
                                         Ben Nisenbaum, Esq.
                                         James Cook, Esq.
                                         Attorneys for Plaintiffs


Dated:  September 28, 2023               **BERTLING LAW GROUP**

                                         /s/ *Jemma Parker Saunders*
                                         Jemma Parker Saunders
                                         Attorneys for Defendant

1                                  GARCIA

Dated:  September 28, 2023               **JEROME M. VARANINI**

_/s/ Jerome Varanini_

Jemma Parker Saunders
Attorneys for Defendants
WELLPATH, INC, MICHAEL DURBIN
MICHAEL NARIA, MARIA SADRI, and
NEENA THOMAS