JOHN L. BURRIS, ESQ., SBN 69888
BEN NISENBAUM, ESQ., SBN 222173
JAMES COOK, ESQ., SBN 300212
LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Center
7677 Oakport Street, Suite 1120 Oakland, CA 94621
Telephone:  (510) 839-5200
Facsimile:  (510) 839-3882
Email:  John.Burris@johnburrislaw.com
Email:  Ben.Nisenbaum@johnburrislaw.com
Email:  James.Cook@johnburrislaw.com
Attorneys for Plaintiffs
BARBARA DOSS, et al.

Austin R. Kessler
Lindsey Romano (SBN 337600)
GORDON REES SCULLY MANSUKHANI
150 Fayetteville Street, Suite 1120,
Raleigh, NC 27601
Attorneys for Defendants
WELLPATH, INC, MICHAEL DURBIN
MICHAEL NARIA, MARIA SADRI, and NEENA THOMAS

Peter G. Bertling (SBN 131602)
Jemma Parker Saunders (SBN 227962)
Bertling Law Group
21 East Canon Perdido Street, Suite 204B
Santa Barbara, CA 93101
Telephone: 805-879-7558
Facsimile: 805-869-1597
peter@bertlinglawgroup.com
jemma@bertlinglawgroup.com
Attorneys for Defendant Guadalupe Garcia

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA DOSS, et al.,<br><br>              Plaintiffs,<br><br>     vs. | CASE NO.: 3:19-cv-07940-CRB<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge: Hon. Charles R. Breyer<br>Date: March 28, 2025 |

COUNTY OF ALAMEDA, et al.,

                    Defendants.

Time: 8:30 a.m.
Crtrm: San Francisco-TBD
Trial Date: TBD

Currently, this matter is stayed pursuant to the Court's Order at Docket No. 150. Pursuant to the Court's Case Management Scheduling Order at Docket No. 151, Plaintiff and Wellpath Defendants submit the following case management statement. Wellpath Defendants prepared the statement and were unable to make contact with counsel for Guadalupe Garcia.

**1.**     Jurisdiction and Service

Plaintiffs filed this case in federal court and assert federal question jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§1391(b).  All defendants have been served. On November 28, 2022, the Court dismissed Defendants COUNTY OF ALAMEDA, JOSHUA PLOSSER, KEVIN CALHOUN, EDUARDO RIVERA-VELAZQUEZ, MONICA DEVINE, JOSEPHINE CONSTANZO, DYLAN GREEN, and ANTHONY MOSCHETTI, with prejudice.

**2.**     Facts

**a.**     Plaintiffs' Contention

The incident took place on June 23, 2018. The location of the incident was Santa Rita 5325 Broder Blvd, Dublin, CA 94568. Santa Rita Jail deputies and Wellpath medical staff caused Armstrong to die as a result of excessive force and deliberate indifference to Armstrong's medical needs.

As part of sentencing in an unrelated criminal matter, Decedent was to serve time by reporting to the Jail Weekend Inmate Program at Santa Rita Jail. The incident in question took place on Decedent's second consecutive weekend reporting to Santa Rita Jail. Decedent had four months to serve in weekend increments at Santa Rita Jail. Upon reporting to Santa Rita Jail, Decedent was cleared and admitted for his weekend comittment by Alameda County Sheriff's Office's intake staff,

in spite of having ingested narcotics sometime before admission and exhibiting clear symptoms that he was under distress.

On June 23, 2018, at approximately 5:25 a.m., Defendant RIVERA-VELAZQUEZ and witness, Deputy Soto, observed Decedent, who had difficulty expressing coherent words to the deputies. Deputy Soto told the Intake Deputies about Decedent's behavior. Deputy Valentine, who began his shift at 5:00 a.m. on June 23, 2018, observed decedent yell "Help me!", with Decedent's behavior worsening, as he kneeled on all fours, cried and desperately continued yelling out "Help me!. Nonetheless, there is no record that suggests that any help was given to Decedent at this time.

Around 7:20 a.m., deputies advised WELLPATH Nurses GUADALUPE GARCIA that ARMSTRONG needed medical help. Deputies requested GARCIA check on ARMSTRONG. GARCIA knew, or should have known, that ARMSTRONG was suffering from the effects of illicit drugs. At approximately 7:31 a.m., GARCIA collected a urine sample from Decedent, without incident. While collecting the sample, ARMSTRONG was incoherrent and slow to respond. However, GARCIA failed to do a medical intake on ARMSTRONG at this time. By around 8:00 a.m., Armstrong told Officer Hoodye that he had ingested multiple substances, and did not feel well. Over the next several hours, Armstrong alerted multiple deputies of his worsening condition, and asked for medical help. However, the deputies and nurses failed to render any medical assistance to Armstrong.

By approximately 2:20 p.m., deputies and nursing staff observed ARMSTRONG sticking his fingers in his mouth and his anus. At that point GARCIA finally tested his urine. A preliminary drug screening test revealed ARMSTRONG had consumed cocaine, methamphetamine, and marijuana. Nurse GARCIA still failed to provide medical care to ARMSTRONG. At approximately 2:36 p.m., Defendant Deputy Townsend observed Decedent's behavior and noted it to be "associated with being

paranoid and scared of everyone around him." Nurse GARCIA and Nurse MARIA SADRI then attempted to complete ARMSTRONG'S triage intake screening. GARCIA and SADRI witnessed ARMSTRONG exhibiting unusual behavior. ARMSTRONG was naked and slowily put his hands out of the cuffing port. His actions were indicative that he was suffering from a medical emergency. Nonetheless, no recorded aid of any sort was provided to Decedent during this time of crisis.

At approximately 3:00 p.m., Deputy Valentine reported that even though Decedent's condition had worsened, he was cleared for further incarceration. Around this time, nurses first alerted Nurse MICHAEL DURBIN that ARMSTRONG was under the influence of illicit drugs. DURBIN and nurse MICHAEL NARIA performed a visual check of ARMSTRONG. They witnessed armstrong appear "zombie like". DURBIN and NARIA failed to take ARMSTRONG'S vitals or provide any medical care to him at that time. Shortly thereafter, DURBIN contacted the Outpatient Housing Unit (OPHU). DURBIN spoke to FNP NEENA THOMAS. ARMSTRONG needed to be transported to a hospital. However, THOMAS made the decision to transport ARMSTRONG to the OPHU instead of a hospital. THOMAS failed to consult with a doctor before making the decision to not transfer ARMSTRONG to the hospital. Still, DURBIN failed to even transfer ARMSTRONG to the OPHU at this time. At approximately 3:31 p.m., members of the nursing staff informed Defendant Deputy RIVERA-VELAZQUEZ that Decedent needed to be transported to the Outpatient Housing Unit. However, there are no records that reflect that Defendant Deputy RIVERA-VELAZQUEZ acted upon this medical advice and Decedent remained in his cell without any care.

Defendants waited almost 24 hours, from the time Armstrong reported to Santa Rita jail to attempt to provide him with the medical care he desperately needed during his time of crisis while in

Defendants' custody. Defendants recklessly disregarded Mr. Armstrongs behavior, which clearly reflected that he needed specialized medical care.

At approximately 6:30 p.m., Defendants finally began to transport Decedent to the Outpatient Housing Unit. Decedent was initially transported by Defendants PLOSSER, RIVERA-VELAZQUEZ and CALHOUN. Shortly after the transportation began, Decedent increasingly became more agitated and distressed as Defendants COSTANZO, DEVINE and GREEN joined the transportation. During transportation, Decedent continued to exhibit symptoms of paranoia and severe distress, resulting in him being reluctant to be taken out of his cell and walked to the Outpatient Housing Unit. At some point during transportation, Defendant Deputies slammed Armstrong down to the ground and began violently striking Decedent with their knees and feet.

Despite showing obvious signs of distress and paranoia, Decedent, while handcuffed behind his back and sitting in a L position, was asphyxiated by restraint, as the officers forced Decedent's upper body towards his feet, with Defendant deputies applying force on Decedent's head, neck, shoulder and back. Defendants then placed Decedent in a WRAP device. In addition, though he was not spitting, a spit mask was placed over Decedent's head.

Shortly thereafter, a nurse attempted to check Decedent's pulse and was unable to locate one. Despite resuscitation efforts, Decedent was pronounced deceased at 7:24 p.m. As stated in the Coroner's Report, Decedent died as a result of being asphyxiated by Defendants during restraint. Plaintiffs contend that that Decedent was dead or dying when the spit mask was put on his face, and that Defendants placed the spit mask to conceal Decedent's actual medical condition, that Decedent was dead or dying.

To add further insult to injury, Alameda County Officials within the District Attorney's Office placed a "media hold" on the coroner's report, which prevented Plaintiffs from accessing the

information for over a year. This report contains critical information that would have provided Decedent's family with answers regarding the circumstances surrounding their loved one's death. Instead, Plaintiffs were simply left to speculate for over one year regarding Decedent's death.

As a result of the Defendants misconduct, the Plaintiffs suffered the loss of their loved one. Mr. Armstrong leaves behind his mother, and two children. As such, Mr. Armstrong's children are entitled to recover damages incurred by Decedent before he died as a result of being denied his right to life and enjoyment of life, and to any penalties or punitive damages to which Decedent would have been entitled to recover had he lived, including damages incurred by Decedent, consisting of pain and suffering he endured during the time he struggled for his life, as a result of the violation of his civil rights.

### b.    Defendants' Contention

Defendants:

Wellpath, Inc. does not provide clinical care to patients at the jail. Rather, California Forensic Medical Group (CFMG) employs medical professional to provide medical care to the prisoner population in Santa Rita Jail. The Defendants, MICHAEL DURBIN, MICHAEL NARIA, MARIA SADRI, and NEENA THOMAS all were employed by CFMG and dedicated their time at CFMG to delivering medical care to the inmates, like Dujuan Armstrong within the jail

This is a wrongful death action regarding an in custody  incident (and then later death) of Dujuan Armstrong ("Armstrong"), a twenty-three year old male, at the Outpatient Housing Unit ("OPHU") of the Santa Rita Jail (SRJ) on June 23, 2018.  During transport to OPHU, Alameda County Sheriff Office ("ACSO") deputies used force to control Armstrong, including the deployment of the WRAP leg restraint and spit mask.  Subsequent to the use of force, Armstrong died.  The County Coroner determined that Armstrong  tested positive for narcotics, and died of asphyxiation.

Priot to his incarcertaion at SRJ, decedent was convicted of burglary and sentenced to serve 120 days in jail. He was authorized to complete his jail time on weekends.  On June 22, 2018 at 8:37 p.m., Decedent arrived at the jail.  Because he answered "no" to all relevant medical questions, he was not given a medical assessment.  Aat 10:15 p.m., he was transferred to a "sobering" cell because of his behavior.

On Saturday, June 23rd, at 6:00 a.m., Decedent admitted to an ACSO deputy that he was under the influence of narcotics—something the deputies had suspected based on Decedent's behavior.  On June 23 at 7:30 a.m., staff completed a medical evaluation of Decedent.  Staff took a urine sample from Decedent and tested it at 2:00 p.m. The sample tested positive for cocaine, methamphetamine and marijuana.  Staff completed a medical assessment of Decedent at 2:36 p.m.Nurse Garcia determined that Decedent;s vital signs were normal, cleatred him to join the jail's population and initiated drug withdrawal protocol. Later in the afternoon, staff moved Decedent to the medical unit OPHU for further and closer observation because of his drug screen and bizarre behavior.

During Armstrong's transport to the OPHU, he physically resisted deputies while he was handcuffed. He attempted to walk in the opposite direction, pushed, and attempted to trip the ACSO deputies before trying to run.  In order to control Decedent and protect themselves, ACSO deputies used force. They took Decedent to the ground and admistered several fist and knee strikes to get him under control.  Deputies also placed Armstrong into a WRAP—a lower body restraint device. Deputies tightened the WRAP's straps and put a spit mask on Decedent. Then, Deputies put Decedent on a gurney.

While being wheeled to the OPHU on a gurney, Decedent's pulse stopped and breathing both stopped. CPR/medical was then immediately administered.  Decedent was then taken to a hopsital where he died at 7:23 p.m.—about 24 hours after he first arrived at SRJ.

On June 25th, Dr. Magat, the Medical Director of CFMG, opined that cardiopulmonary arrest was the preliminary cause of death. She noted that Armstrong was 5'11" and weighed 271 pounds. At intake, he appeared angry and uncooperative. His drug screen confirmed the presence of marijuana, cocaine, and methamphetamine. Dr. Magat noted that Decedent became increasingly agitated while being transported to OPHU resulting in ACSO deputies using force to restrain him.

Dr. M. Ferenc, a forensic pathologist, completed Decedent's autopsy. The coroner determined Decedent's cause of death was mechanical asphyxia with cardiac hypertrophy and obesity being listed as other conditions. The coroner further determined that while the toxicological analysis confirmed drugs in Decedent's system, these drugs did not contribute to his cause of death. Notably, the coroner found that Decedent had preexisting pulmonary congestion, cardiac hypertrophy and dilation, and borderline severe obesity. Combined with his severe obesity, preexisting heart issues, agitation, and physical exertion, Decedent's toxicology results suggest that excited delirium possibly contributed/caused his death. The cause and manner of Decedent's death will be considerable issue in this case. Wellpath Defendants deny the Plaintiffs' contentions regarding this issue. They assert that the care provided to Decedent was appropriate and deny all allegations of deliberate indifference.

Medical defendants assert that the care provided to the inmate patent Mr. Armstrong was appropriate for the condition as presented by the patient and that there was no deliberate indifference to any serious medical need of the patient as alleged or at all. Medical defendants further contend that all care provided to Mr. Armstrong met appropriate standards of care, and nothing they did or did not do caused or contributed to decedent's death and plaintiffs' damages. Defendants contend at all times appropriate policies and procedures were in place and there is no basis for a *Monell* claim as to these defendants.

    **3.**    Legal Issues

The FAC currently asserts the following federal claims against the remaining Defendants: 1) Section 1983 violation of the Eighth Amendment – Decedents Right to be Free from Cruel and Unusual Punishment; 2) Section 1983 violation of Fourteenth Amendment – Plaintiffs' civil right to a

familial relationship; In addition, the FAC asserts the following state law claims: 1) violation of California Civil Code § 845.6; 2) negligence.

These claims raise at least the following issues:

• Whether Defendants violated Decedent's and Plaintiffs' constitutional and statutory rights through their policies, practices, and customs (42 U.S.C. § 1983, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).)

• Whether there was an underlying constitutional violation to support a *Monell* theory of liability.

• Whether defendants by their acts, omissions, customs, and policies, acting in concert/conspiracy, violated Plaintiffs' rights to be free from deliberate indifference to his serious but treatable medical needs and/or access thereto; to be free from wrongful government interference with familial relationships. (Cal. Civ. Code §§ 52 and 52.1.)

• Whether Defendants had a duty of care to Plaintiffs and whether they breached that duty to provide sufficient, competent, prompt medical care and/or access thereto to decedent.

• Whether Defendant's medical providers had a duty of care to Plaintiffs to provide decedent competent and reasonable medical care and treatment and/or access thereto, whether they breached that duty; whether Defendant WELLPATH are vicariously liable for their employees or agents.

• Whether any Defendant caused, contributed or was a substantial moving factor in causing any of Plaintiffs' alleged damages or Decedent's death.

• Whether any defendant, acting under color of state law, deprived Plaintiffs of their right to a familial relationship in violation of the Fourteenth Amendment.

• Whether and to what extent, each separate Defendant is liable for general damages, treble damages and/or for punitive damages.

• Whether any individual defendant is entitled to qualified immunity.

• Whether Plaintiffs' state law claims are barred by various California Government Code immunities.

• The extent of Plaintiffs, decedent, and/or third parties' responsibility for decedent and Plaintiffs' injuries and damages, and the extent to which Plaintiffs, decedent, and/or third parties' responsibility reduces any damages for which Defendants may be liable..

### 4. Motions

Plaintiffs anticipate filing motions *in limine*. Wellpath Defendants anticipate filing motions *in limine* and a motion for summary judgment/summary adjudication. Defendant Garcia remains represented by Bertling Law Group and will file a motion for summary judgment/summary adjudication, and motions *in limine*.

### 5. Amendment of Pleadings

Plaintiffs do not anticipate a need to amend the pleadings at this time. Wellpath Defendants anticipate that Plaintiffs will need to amend the First Amended complaint because they included an improper corporate entity—WELLPATH INC.

### 6. Evidence Preservation

Both Plaintiffs and Defendants are aware of their duty to preserve evidence and have taken steps to preserve all potentially relevant evidence.

### 7. Disclosures

The parties have made their initial disclosures.

**8.** Discovery

The Parties have participated in written discovery. The parties have not yet completed depositions. The parties do not anticipate the need for additional discovery beyond what is permitted by standard procedure but will approach the court if it becomes necessary to adjust these limits.

**9.** Class Actions

This is not a class-action matter.

**10.** Related cases

The parties are unaware of any related cases.

**11.** Relief

Plaintiffs are seeking general, special, and punitive damages in an unspecified amount. Defendants are seeking a dismissal of the case and the potential for recovery of costs and fees.

**12.** Settlement and ADR

The parties attended a settlement conference on May 28, 2024 at 10:00 a.m. before Honorable Judge Laurel Beeler. The conference was brief and did not resolve the claims. Plaintiffs are open to additional settlement discussions. Defendants request another settlement conference or other ADR proceeding prior to trial.

**13.** Consent to Judge for All Purposes

Plaintiffs consented to a Magistrate Judge. Wellpath Defendants prefer Your Honor handle this case in all respects.

**14.** Other reference

The parties do not believe the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**15.** Narrowing of Issues

None at this time.

**16.** Expedited Schedule

The parties do not request an expedited schedule at this time.

**17.** Scheduling:

Currently, this matter is stayed pursuant to the Court's Order at Docket No. 150.

**18.** Trial:

The parties have demanded a jury trial, expected to last approximately 10-14 days.

**19.** Disclosure of Non-Party Interested Entities or Persons:

Plaintiffs: None.

Defendants: None.

**20.** Other matters

None at this time.


Dated: March 21, 2025          **THE LAW OFFICES OF JOHN L. BURRIS**

/s/ *James Cook*
Ben Nisenbaum, Esq.
James Cook, Esq.
Attorneys for Plaintiffs


Dated: March 21, 2025          **GORDON REES SCULLY MANSUKHANI, LLP**

/s/ *Lindsey Romano*
Lindsey Romano
Austin R. Kessler
Attorneys for Wellpath Defendants